**UTAH ASSOCIATION OF COUNTIES, a Utah nonprofit corporation, and Box Elder, Morgan, Salt Lake, Utah, and Weber Counties, political subdivisions of the State of Utah, Petitioners,**

v.

**TAX COMMISSION OF the STATE OF UTAH, ex rel. MCI TELECOMMUNICATIONS CORPORATION, Respondents.**

Nos. 920452, 930438 and 930530.

Supreme Court of Utah.

April 19, 1995.

Bill Thomas Peters, Salt Lake City, for petitioners.

Jan Graham, Atty. Gen., Brian L. Tarbet, Asst. Atty. Gen., Salt Lake City, for Tax Com'n.

Maxwell A. Miller, William J. Evans, K.C. Jensen, Salt Lake City, and Douglas A. Richards, Washington, DC, for MCI.

HOWE, Justice:

The Utah Association of Counties (UAC) and Box Elder, Morgan, Salt Lake, Utah, and Weber Counties (collectively "the Counties") seek review of a decision of the Utah State Tax Commission assessing the fair market value of the operating property of MCI Telecommunications (MCIT) for ad valorem tax purposes at $5,506,900,000 as of the lien date of January 1, 1990. The Commission determined that .45% of that amount, $24,781,050, was allocable to Utah.

## BACKGROUND

MCIT is a wholly owned subsidiary of MCI Communications Corporation (MCI). The stock of MCI is publicly traded on the

NASDAQ exchange. MCIT accounts for approximately 90% of MCI's total assets and is the second largest telecommunications network in the world. The Federal Communications Commission (FCC) has authority to regulate MCIT's rates but has not done so— competition is allowed to dictate its rates. MCI has experienced significant growth since its incorporation in 1968 and now holds 12 to 15% of the total long distance market.

In early 1990, the property tax division of the Commission determined that as of the lien date, the total value of MCIT's operating system was $7,900,000,000. Later, the division amended its assessment, reducing it to $7,850,000,000, with .45%, or $35,325,000, allocable to Utah. MCIT timely protested the division's valuation and submitted an independent appraisal report prepared by John E. Green and Associates which fixed the value at $3,700,000,000, with .45%, or $16,650,000, allocable to Utah. Following a formal hearing, the Commission rejected the value asserted by both MCIT and the division and fixed the total value of MCIT's property at $5,506,900,000, with $24,781,050 allocable to Utah. The Commission denied a joint petition for reconsideration filed by the division, the Counties, and UAC. The Counties and UAC now seek review of the Commission's decision and order.

## ANALYSIS

### A. UAC's Standing

■ At the outset, the Commission and MCIT challenge UAC's and the Counties' standing to petition for review. They contend that UAC and the Counties failed to properly intervene in the proceedings before the Commission. They rely upon Utah Code Ann. § 59-2-1007(1), which provides that any county "with a showing of reasonable cause" may timely object to an assessment and "upon a showing of reasonable cause" shall be allowed to intervene in any hearing before the Commission. Here, UAC and the Counties did not protest the assessment of MCIT, nor did they show reasonable cause for inter-

vention. MCIT and the Commission further rely on section 63-46b-9(1), which provides, "Any person not a party may file a signed, written petition to intervene in a formal adjudicative proceeding with the agency...." Commission rule 861-1-5A(J) likewise provides for intervention upon the petition of a party.

A similar challenge to UAC's standing was made in the recent case of *Utah Association of Counties v. Tax Commission of the State of Utah ex rel. American Telephone & Telegraph Co.*, 895 P.2d 819 (Utah 1995). There, UAC did not submit a formal motion to intervene. However, counsel for UAC actively participated throughout the entire hearing, including examination of witnesses with the permission of the Commission. Neither the Commission nor the taxpayer objected to UAC's participation. We held that the Commission had waived its right to challenge UAC's participation in the review before this court and that UAC had adequately intervened on a de facto basis. *Id.* at 820–21.

The same result follows in this case. Counsel for UAC and the Counties conducted a cross-examination of John E. Green, one of MCIT's witnesses, and a portion of the direct examination of Michael A. Goodwin, one of the division's witnesses. Neither the Commission nor MCIT objected to this participation at the hearing. While we commend to the Commission the observance of the statutes and its own rules regarding intervention, we conclude again that there has been a waiver of any objection to UAC's and the Counties' participation and that they adequately intervened on a de facto basis. Hereafter, UAC and the Counties shall be referred to collectively as UAC.

### B. Stock and Debt Method

■ UAC first assails the Commission's conclusion that the stock and debt method of appraisal was unreliable and caused the Commission to disregard the appraisal of both parties which used that method.[1] In-

---

1. Under the stock and debt method of appraisal, the market value of the utility's common and preferred stock is added to the market value of its bonds (or debt). Eckhardt A. Prawitt, *Valuation and Apportionment of Utilities and Railroads*

stead, the Commission relied primarily on the income approach to value.[2] UAC argues that the purchase of stock is in essence the purchase of a portion of a company's assets. Thus, UAC urges, "[T]he price investors are willing to pay for a portion of the company's assets is representative of the fair market value of the equity portion of a company's value, within the context of determining value for ad valorem tax purposes."

Evidence adduced at the hearing before the Commission clearly supports the Commission's decision to disregard the stock and debt method. Mr. Green, who made an appraisal for MCIT, testified that in MCIT's situation, the stock and debt approach was unreliable. Although he used that approach in his appraisal so as to thoroughly consider all approaches to value, he ultimately gave it no weight in his final determination. He gave two reasons for not relying upon it. First, he testified that the stock purchaser is generally not a "knowledgeable buyer" as required by the statutory definition of "fair market value" found at Utah Code Ann. § 59-2-102(7). He explained:

> Anyone [who] is familiar with the [stock] market knows that it's quite a herd instinct, that buyers of common stock if they see a stock moving rapidly on the upside, they'll say to themselves, "someone knows something so I better buy some of it, and it goes up. . . ." So the problem then becomes how do you get a realistic value of the total common stock that's owned by a corporation. Same thing is true for a long-term debt and the preferred stock except it's not quite as volatile.

Mr. Green's second reason was that a stock purchase cannot be equated with the purchase of part of the underlying assets because stock "includes an ownership claim upon tangible and intangible assets and expectations." He pointed out that buyers of stock are not only buying what presently exists, but they also are buying anticipated growth with a rapidly growing company such as MCI. This creates difficulty in determin-

ing what portion of a stock price should be allocated to tangible assets, which are taxable, and what portion should be allocated to intangible assets, which are not taxable. Notably, not only did Mr. Green disregard the stock and debt approach, but Sheldon Draper, who made the appraisal for the division, gave little weight to the approach. Support for the approach came largely from two other experts called to testify by the division. Dr. Steven Hanke and Mr. Goodwin both testified that in their opinions, the stock and debt method was the only objective indicator of value. Neither of these experts actually appraised MCIT's property. In sum, the Commission had before it a diversity of expert opinion as to the merit of the stock and debt approach, and its decision to give that approach little or no weight is fully supported by the evidence. Instead, the Commission opted to place its reliance upon the income approach, which was favored by Mr. Green and Mr. Draper.

### C. Construction Work in Progress

■ UAC next contends that the Commission erred in failing to assign any value to construction work in progress (CWIP). CWIP is defined as improvements and personal property that are not functionally complete and thus are not yet capable of providing an economic benefit to the owner. *See* Utah Admin.R. 884-24-20P(A)(1). UAC points out that this rule mandates that the value of CWIP be added to the cost and income indicators of value. UAC argues that the value of CWIP must be added to the income indicator which was relied upon by the Commission in this case in order to properly account for all nonexempt property in the assessment process. In a joint petition for reconsideration, the division and UAC urged the Commission to add an additional $448,975,087, which they calculated was the discounted value of CWIP, to the figure announced by the Commission as its determination of value. The Commission denied the petition, stating that CWIP had already been included in the income stream and that add-

---

*in the State of Utah* (May 16, 1991) [hereinafter Prawitt].

**2.** The income approach to value may be described as "any method that converts future anticipated income into present value." Prawitt, *supra,* note 1.

ing it again would result in double taxation. UAC asserts that "the Commission apparently believed that because it adopted an income estimate based on MCI's recent performance and current outlook, the estimate was future-looking and accounted for the income potential from all MCI's property." But UAC contends that the value of CWIP cannot be reflected in the net operating income of the operating entity and its exclusion was therefore improper.

We find no error. The record reflects that the value of all of MCIT's property, including CWIP, is accounted for in the income indicator which the Commission adopted. The Commission adopted an income estimate of $1,065,000,000 as a stabilized income stream because it was at the high end of income estimates and was based on "MCIT's recent performance and current outlook." The estimate captured the maximum income MCIT could earn from its existing plant, including CWIP. The Commission explained that it placed a value on MCIT's property at the higher end of the income indicator value range to account for all future growth of existing taxable assets and value expected to be realized from CWIP. This determination by the Commission is supported by the testimony of Mr. Green that CWIP was included in his value estimate. As mentioned above, the Commission adopted the yield capitalization income indicator proposed by Mr. Green, with some adjustments. The Commission agreed with Mr. Green that CWIP was included in his income indicator of value and that it would be error to make any addition.

### D. Admission of Testimony and Appraisal

 UAC next contends that the Commission erred in failing to sustain the division's objection to the admission of Mr. Green's testimony and appraisal. The objection was based upon Utah Code Ann. § 59–2–701(1), which in 1990, when Mr. Green's appraisal was prepared and submitted, provided in part:

Any person performing an appraisal for purposes of establishing fair market value *for the assessment roll* shall be the holder of an appraiser's certificate or registration issued by the Division of Real Estate under Chapter 2(b), Title 61....

(Emphasis added.) UAC also relies upon section 61–2b–3(1), which provides:

It is unlawful for anyone to prepare an appraisal, an appraisal report, or a certified appraisal report relating to real estate or real property in this state without first being registered or certified in accordance with the provisions of this chapter.

UAC points out that Mr. Green testified that his appraisal was prepared for purposes of establishing the fair market value of property for ad valorem tax purposes. Therefore, it argues that Mr. Green prepared his valuation report or appraisal for purposes of establishing the fair market value of the property for inclusion in the "assessment rolls" as contemplated in section 59–2–701(1). UAC asserts that section 61–2b–3 specifically precludes an individual from preparing an appraisal report relating to real estate or real property without first being registered or certified. Mr. Green was neither, and his appraisal encompassed the value of real property and improvements owned by MCIT. The value ultimately found by the Commission is transferred to each county containing MCIT's property where it is subjected to ad valorem tax.

We find no error in the admission of Mr. Green's testimony and appraisal report. Section 59–2–701(1), by its very terms, applies only to persons preparing an appraisal for the assessment rolls. It appears to have been narrowly drawn to affect only Commission employees and county personnel who prepare assessments for the assessment roll, requiring that they possess a minimum level of training and experience. Only the Commission and the Counties are charged with the legal duty to prepare assessments for the assessment roll. Utah Code Ann. §§ 59–2–201, –203. Mr. Green testified before the Commission and submitted his appraisal report for the sole purpose of supporting MCIT's request for Commission action to reduce its tax assessment. While he did prepare an appraisal for determining fair market value for ad valorem tax purposes, he did not prepare an appraisal "for the assessment roll." In addition, it should be ob-

served that the value of MCIT's property was determined under the unitary method or unit rule method. In other words, the value of MCIT's property in Utah was derived by first determining the value of MCIT's entire nationwide system as a unit and then apportioning a part of the whole value to Utah. Neither the division nor Mr. Green determined the value of each specific property owned by MCIT in Utah.

Nor did Mr. Green run afoul of section 61–2b–3, which makes it unlawful to prepare an appraisal relating to real estate without first being registered or certified with the real estate division. Again, in preparing a unit method appraisal of MCIT, Mr. Green did not identify specific parcels of real property in Utah. He included real property only to the extent that it was included in the value of MCIT's entire operating unit. Section 61–2b–2(1) defines an appraisal as "an analysis, opinion, or conclusion prepared by a real estate appraiser relating to the nature, quality, value, or utility of specified interest in, or aspects of, *identified* real estate or *identified* real property." (Emphasis added.) No real estate was identified in Mr. Green's appraisal report.

### E. Improper Use of the Income Approach

■ Finally, UAC contends that the Commission improperly utilized accounting "earnings" as opposed to "cash flow" in determining the value under the income approach, which resulted in a significant undervaluation of MCIT's operating properties. UAC argues that "in a properly constituted model of the yield capitalization method, the income capitalized is cash flow.... [C]ash flow is equal to income, plus all non-cash expenses, such as depreciation and deferred income taxes." However, UAC continues, the income stream which the Commission capitalized was derived from the appraisal prepared by Mr. Green as an estimated future income based upon pro forma operating statements. The statements summarize revenue, less operating expenses, including depreciation. Mr. Goodwin, a witness who testified for the division at the hearing, criticized Mr. Green's appraisal because he had deducted depreciation as an expense from the cash flow.

We find no merit to UAC's contention. Mr. Green testified that cash flow would ordinarily include an add back for all noncash expenditures such as depreciation. However, he deducted depreciation from the income stream he capitalized because he assumed that depreciation would roughly equal capital expenditures and could therefore be eliminated from the computation of net cash flow. He made this assumption because MCIT is currently reinvesting the bulk of its earnings into upgrading its equipment—particularly its switching equipment. He explained that MCIT is investing in digital switching equipment, which will improve its capacity. As of the lien date of January 1, 1990, it did not have those assets. Consequently, he valued the assets existing on that date and not the assets that MCIT might acquire in the future. He further explained that since the capital expenditures necessary to upgrade the equipment would be speculative, he assumed it would roughly equate to depreciation and he was able to simplify the formula without compromising his accuracy. He stated that if capital expenditures are not taken as a deduction, an appraiser should permit a depreciation allowance. Either way, whether a capital expenditure deduction or a depreciation allowance is taken, the result is approximately the same. The Commission heard and considered Mr. Goodwin's criticisms of Mr. Green's methodology but opted to accept Mr. Green's method of allowing depreciation, as was its prerogative. *Questar Pipeline Co. v. Utah State Tax Comm'n,* 850 P.2d 1175, 1178 (Utah 1993).

We affirm the Commission's decision.

ZIMMERMAN, C.J., DURHAM and RUSSON, JJ., and ORME, Court of Appeals Judge, concur.

STEWART, A.C.J., having disqualified himself, does not participate herein.

ORME, Court of Appeals Judge, sat.