BEAVER COUNTY, Box Elder County, Cache County, Carbon County, Daggett County, Davis County, Duchesne County, Emery County, Garfield County, Grand County, Iron County, Juab County, Kane County, Millard County, Morgan County, Piute County, Rich County, Salt Lake County, San Juan County, Sanpete County, Sevier County, Summit County, Tooele County, Uintah County, Utah County, Wasatch County, Washington County, Wayne County, and Weber County, Petitioners,

v.

UTAH STATE TAX COMMISSION and PacifiCorp, Respondents.

No. 950015.

Supreme Court of Utah.

April 25, 1996.

Bill Thomas Peters, Salt Lake City, for petitioners.

Jan Graham, Atty. Gen., Kelly W. Wright, Asst. Atty. Gen., Gregory B. Monson, Salt Lake City, for respondents.

Maxwell A. Miller, Salt Lake City, for amici Utah Mining Association, Utah Taxpayers Association, Utah Manufacturers Association, Utah Petroleum Association.

RUSSON, Justice:

Petitioners (the Counties) seek review of a ruling of the Tax Commission (the Commission) adopting a revised property tax assessment of PacifiCorp's electric utility system for the 1992 tax year. The revised assessment was agreed upon by the Property Tax Division of the Tax Commission (the Division), which is the division responsible for assessing property for the Commission, and PacifiCorp. We affirm.

## I. BACKGROUND

On May 1, 1992, the Division sent PacifiCorp, engaged in the electric utility business as Utah Power & Light Co., a notice of assessment. In the notice, the Division informed PacifiCorp that it had $2,665,270,580 of taxable electric utility property in Utah. On May 28, 1992, PacifiCorp petitioned the

Commission for redetermination, claiming that the Division's assessment was too high.

On August 27, 1992, Emery County moved to intervene in PacifiCorp's appeal, claiming that the original assessment was valid and that any reduction would be improper and would have a detrimental impact on the county's ability to meet its financial obligations. On January 15, 1993, the Commission granted Emery County's motion to intervene.

Prior to Emery County's intervention, PacifiCorp, the Division, and Emery County held discussions concerning the appraisal methodology of the original assessment. The Division, as part of the Tax Commission, is statutorily and constitutionally responsible for assessing the fair market value as of the lien date, January 1, of certain types of property including public utility property. Utah Const. art. XIII, § 11; Utah Code Ann. § 59-2-104. In doing so, the Division generally employs three recognized approaches or indicators of value—cost, income, and market—if the indicators are applicable to the property under consideration and if reliable information exists to apply the indicators. The cost approach determines property value on the basis of its cost less depreciation. The income approach determines the value of property by, first, determining the reasonable income expected to be earned by the property and, second, capitalizing that income by the return expected to be realized on comparable properties in the market to compute the present value of the anticipated income. The market approach uses the prices at which comparable properties are bought and sold as a basis for determining the value of the property under appraisement. Because large utility systems such as PacifiCorp's are rarely bought or sold, the Division uses a surrogate market approach known as the stock and debt approach. Under this indicator, the market value of a utility's property is determined by considering the market value of the utility's common and preferred stock in addition to the market value of its bonds (or debt). Following application of these indicators, the indicators' results are reconciled to a single estimate by the Division's appraiser based upon his opinion of the relative applicability, accuracy, and

probity of each indicator. Because the indicators are used to appraise the value of all of a utility's holdings, including property outside Utah, an allocation factor is used to determine the value of the property in Utah. The application of the stock and debt, income, and cost indicators of value constituted the subject matter of the discussions between PacifiCorp, the Division, and Emery County.

PacifiCorp contended, and the Division later agreed, that the Division's original assessment contained two errors under the stock and debt approach. First, the Division incorrectly included the stock market value of PacifiCorp's holdings in two nonelectric subsidiaries. These holdings were not part of PacifiCorp's utility operations and were therefore beyond the scope of the Division's appraisal. This error resulted in an overvaluation of the stock and debt indicator of PacifiCorp's total utility system value by approximately $195 million. Second, the Division failed to make adjustments to account for the nonoperating property of PacifiCorp's utility system. Although this property is subject to property taxation at its situs, it was not part of PacifiCorp's operating utility system and thus was beyond the scope of the Division's appraisal. This error resulted in an overstatement of the stock and debt indicator by approximately $520 million. The Division corrected these two errors, reducing the stock and debt indicator of PacifiCorp's utility system value by about $715 million.

The Division also agreed to change its original stock and debt indicator due to matters of appraiser judgment. According to the Division, in determining market value under the stock and debt approach, an appraiser should use a normalized stock price. Appraisers typically do not use the stock price exactly as of the lien date, January 1, because stock is not traded on that day, a holiday, and because use of a "spot price" might result in significant distortions in value due to market volatility. Various methods are used to estimate a normalized stock price. In its original assessment, the Division used a fourth quarter average price. Following a recent Commission decision, *Union Pacific Railroad v. Property Tax Division of the State of Utah Tax Commission,*

Appeal No. 89–0967 (Findings of Fact, Conclusions of Law and Final Decision, December 21, 1992), the Division concluded that the use of an annual average stock price was more appropriate.

Also, the parties discussed the Division's allocation of PacifiCorp's common stock. Because PacifiCorp's common stock represented equity in an entity greater than the electric utility system and because the Division endeavored to assess only PacifiCorp's electric utility system, the Division had to allocate stock between the nonutility and the utility operations. Initially, the Division used only the income of PacifiCorp's utility system to allocate the stock. Moreover, in determining the income for the separate portions of the business, the Division used information from different sources—PacifiCorp's financial reports and PacifiCorp's regulatory reports to the Federal Energy Regulatory Commission—that PacifiCorp claimed was incompatible. Different accounting methods are used in financial reports than are used in regulatory reports because regulatory agencies are free to prescribe accounting rules different than the generally accepted accounting principles required in financial reporting. Upon further analysis, the Division decided to use information other than merely the information about PacifiCorp's income to allocate the stock and derive its income data from more compatible sources. This change further reduced the stock and debt indicator of value.

■ The parties also discussed the income indicator of value. As with the stock and debt indicator, the use of annual average stock prices adjusted the income indicator

because stock prices are used to determine the capitalization rate. Under this indicator, the taxpayer's estimated income is divided by a capitalization rate to convert future anticipated income into present value. The appraiser can use either direct capitalization or yield capitalization. In this case, the Division decided to use the direct capitalization method. Under this approach, the capitalization rate is based upon the earnings-to-price ratios of comparable companies and debt rates.[1] The earnings-to-price ratio is determined by dividing the comparable companies' respective earnings by their respective stock prices.[2] The time period used in calculating this ratio should match the period for which income is estimated. In the original assessment, the Division used a 1991 twelve-month income estimate but an earnings-to-price ratio based only upon fourth quarter average stock prices. Using annual average stock prices resulted in an increase in the capitalization rate. Dividing the income estimate by this higher rate resulted in a decrease in the income indicator for the utility system by approximately $447 million.

Not all of the changes made to the Division's original appraisal resulted in reductions to the assessment. An additional change to the income indicator was made at the behest of Emery County. Emery County pointed out that PacifiCorp had acquired an electricity generation plant in Arizona in 1991. Emery County persuaded the Division that the original income estimate did not take into account the full impact of this acquisition. As a result, the Division increased its original income estimate by $12 million,

---

1. " 'Yield capitalization is a method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate or by developing an overall rate that explicitly reflects the investment's income pattern, value change, and yield rate.' " *Utah Assoc. of Counties v. Tax Comm'n*, 895 P.2d 819, 821 n. 3 (Utah 1995) (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 420 (10th ed. 1992)).

2. An example of the direct capitalization concept was offered to the Commission:
 You are interested in acquiring a particular house as an investment and, having surveyed the market, feel certain that you can rent it out for $4,800 annually. Your cousin recently ac-

quired a house in the same neighborhood for $60,000 which he rents out for $6,000. Based on these facts, how much are you willing to invest in the house?
 You first calculate a capitalization rate based on your cousin's rental:

$$\frac{\$6,000 \; income}{\$60,000 \; price} = 10\% \; [capitalization] \; rate$$

 You then divide (capitalize) the income you expect to receive by the capitalization rate,

$$\frac{\$4,800 \; income}{10\% \; rate} = \$48,000 \; price$$

giving you the indicated purchase price of $48,000.

which led to a substantial increase in the income indicator of value.

Following the corrections to the various indicators of value discussed above, the Division reconciled the indicators' results to a single estimate based upon its opinion of the relative applicability, accuracy, and probity of each indicator. The Division disclosed that it gave greater weight to the income indicator and lesser weight to the stock and debt and cost indicators. After reconciling the indicators into a single value estimate, the Division's appraisal for the total system value changed from $7,156,000,000 to $6,800,000,-000. An undisputed factor to apportion the value of the Utah properties was applied and county-assessed property was deducted, resulting in a $2,529,862,720 final appraisal, a 5.1 percent reduction from the $2,665,270,580 original appraisal. In January 1993, Pacifi-Corp stipulated that this revised assessment represented the fair market value of its properties.

On March 4, 1993, the Division and Pacifi-Corp filed the stipulated assessment with the Tax Commission, and both moved for entry of an order directing the counties affected by the stipulated assessment to show cause why the Commission should not accept the stipulated assessment. Emery County objected to the revised assessment and the motion on the ground that the revised assessment was too low.

While PacifiCorp and the Division's motion was pending, Emery County served interrogatories and requests for documents on Pacifi-Corp. PacifiCorp moved for a protective order barring discovery by Emery County pending a decision on the motion for an order to show cause. Over the telephone, an administrative law judge for the Commission told Emery County's attorney that it would not order PacifiCorp to comply with Emery County's discovery requests while PacifiCorp and the Division's motion was pending. On April 29, 1993, during a prehearing conference before the Commission, the Division and PacifiCorp agreed to provide Emery County with access to the original assessment and all the documents relied upon for that assessment. As a result, Emery County, as well as the other counties which later became in-volved, had access to the same information available to the Division.

On December 29, 1993, the Commission granted the Division and PacifiCorp's motion and issued an order directing the counties affected by the stipulated assessment to show cause why the new assessment should not be approved. On January 27, 1994, the Counties filed objections based upon a review of the revised assessment by Eckhardt Praw-itt, an appraiser formerly employed by the Division who performed the original apprais-al of PacifiCorp's utility system.

On May 5, 1994, the Counties' objections were presented at a hearing before the Commission. The Counties argued that the revised assessment improperly applied the stock and debt and the income indicators of value. The Counties argued that under both indicators, PacifiCorp and the Division improperly used an annual average stock price which yielded an estimate of value as of July 1, 1991, rather than as of the statutory lien date, January 1, 1992. The Counties also argued that the Division improperly placed more significance on the cost indicator than on the stock and debt indicator. According to Mr. Prawitt, "It doesn't make sense to me. The cost indicator is not a market indicator of value, while the income and stock indicators are, yet more weight is given to the cost indicator then [sic] one of the market indicators."

The Division's appraisal expert D. Brent Eyre, the assistant director of the Division, testified that the use of annual average stock prices rather than year-end stock prices was consistent with proper appraisal methodology. According to Mr. Eyre,

> [M]ost appraisers feel that you should use some type of normalized price and there are [sic] a wide gambit [sic] as to what type of time frame you should look at in determining a normalized price.

Mr. Eyre further testified that it could not be said that the cost indicator was weighted over the stock and debt indicator; all that could be said was that the income indicator was given primary importance while the cost and stock and debt indicators were given secondary importance. Even so, continued

Mr. Eyre, the weighting scheme employed by the revised assessment was consistent with accepted appraisal theory.

Following the hearing, the Commission requested supplemental information, including the methodological basis for the original assessment, the underlying methodological basis for any changes to the original assessment, and a discussion of whether the original assessment and any subsequent adjustments thereto were appropriate representations of fair market value. PacifiCorp and the Counties responded by submitting briefs. The Division responded with the affidavit of Mr. Eyre. Mr. Eyre concluded that the methodologies adopted by the Division in the settlement were accepted methods for estimating fair market value and the adjustments made by the Division were based upon facts and appraiser judgment properly employed under accepted appraisal theory.

On December 12, 1994, the Commission, having determined that the Counties had the burden of showing a material mistake of fact or law with regard to the stipulated assessment, ruled that the Division's valuation methodologies were appropriate and that the Counties had not met their burden. The Counties sought review.

The Counties argue that (1) by delaying a ruling approving or disapproving the revised assessment beyond the statutory deadline, October 1, 1992, the Commission lost jurisdiction over PacifiCorp's appeal; (2) the Commission improperly restricted Emery County's discovery and thereby limited its ability to dispute the revised assessment of PacifiCorp's property; (3) the Commission's approval of the revised settlement is inconsistent with both generally accepted appraisal theory and the Commission's statutory guidelines; (4) the Commission improperly placed the burden of proof on the Counties instead of on PacifiCorp, which should have been obliged to carry the burden of showing that its petition for redetermination should be granted; and (5) the Commission improperly determined that the Counties were obliged to show that the revised assessment contained a material mistake of fact or law.

The Commission and PacifiCorp respond that (1) the statutory deadline is directory only and the Commission's failure to meet the deadline does not result in its loss of jurisdiction over PacifiCorp's appeal; (2) Emery County had access to all the information made available to the Division and therefore had no need for more discovery; (3) the Commission's approval of the revised assessment was based on factual findings supported by substantial evidence and therefore the approval should be upheld; (4) PacifiCorp had no burden of proof because the Commission approved the revised assessment, and the burden shifted to the Counties to show why the Commission should reject the revised assessment; and (5) the Commission correctly charged the Counties with the burden of showing that the revised assessment contained a material mistake of fact or law.

## II. ANALYSIS

■ The first issue is whether the Commission lost its jurisdiction over PacifiCorp's appeal by failing to issue a written decision by an October 1 statutory deadline set forth in section 59–2–1007(3) of the Utah Code. Whether section 59–2–1007(3)'s time limitation is jurisdictional is a matter of first impression. Hence, a review of the statutory framework is in order.

The Commission is solely responsible for assessing the fair market value of public utility property for property tax purposes. Utah Code Ann. § 59–2–201(1)(b). Section 59–2–201(1) requires that the Commission assess public utility property by May 1 of each year to determine the tax owed for the year. If the property owner or any county with a showing of reasonable cause objects to the assessment, that party may, on or before June 1, apply to the Commission for a hearing to voice its objections and seek relief. Utah Code Ann. § 59–2–1007(1). Section 59–2–1007(3) further provides, "The commission shall set a time for hearing the objection and render a written decision no later than October 1." The remaining subsections of the statute are triggered if the Commission proposes to adjust an initial assessment. If this occurs, counties affected by the proposed

adjustment must be given notice and an opportunity to show good cause "why the assessment should not be adjusted." *Id.* § 59–2–1007(4).

In this case, following the delivery of the Division's initial assessment to PacifiCorp on May 1, 1992, PacifiCorp filed a timely petition for redetermination on May 29, 1992. However, no written decision was rendered by the Commission until December 12, 1994, over twenty-five months beyond the October 1, 1992, statutory deadline. Arguing that the Commission's failure to render a timely decision resulted in the Counties' inability to prepare accurate budgets, the Counties insist that by failing to comply with the October 1 deadline, the Commission lost jurisdiction and the original assessment should be reinstated.

 In determining whether a statutory time frame is jurisdictional,

"[t]he general rule is that a statute, prescribing the time within which public officers are required to perform an official act, is directory only, unless it contains negative words denying the exercise of the power after the time specified or the nature of the act to be performed, or the language used by the Legislature shows that the designation of time was intended as a limitation."

*Kennecott Copper Corp. v. Salt Lake County,* 575 P.2d 705, 706 (Utah 1978) (quoting *State ex rel. Wight v. Park City School Dist.,* 43 Utah 61, 66, 133 P. 128, 129 (1913)). Generally, the goal of the test is to distinguish statutory time designations which are "'of the essence of the thing to be done,'" and therefore mandatory and jurisdictional, from designations "'which are given with a view merely to the proper, orderly and prompt conduct of the business, and by the failure to obey no prejudice will occur to those whose rights are protected by the statute.'" *Id.* (quoting 1A Sutherland, *Statutory Construction* § 25.03, at 299–300 (4th ed.)). Designations of the latter type are deemed merely directory, and failure to comply does not result in the loss of jurisdiction. *Id.*

 The standard of review for this issue is governed by section 59–1–610 of the Utah

Code. That section provides, "When reviewing formal adjudicative proceedings commenced before the commission, the ... Supreme Court shall ... grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue before the appellate court." Utah Code Ann. § 59–1–610(1)(b). The proceeding from which the Counties appeal was a formal adjudicative proceeding. In subsection (1) of rule 861–1A–5 of the Utah Administrative Code, categories of Tax Commission proceedings designated as informal are listed, but appeals from property tax assessments are not included. Subsection (2) of the rule provides that all categories of proceedings not listed in subsection (1) are to be deemed formal. Therefore, appeals from the Commission's property tax assessments are resolved in formal proceedings. Also, the Commission's conclusion that section 59–2–1007(3) is directory is a matter of statutory construction and hence is a conclusion of law. *See State v. Pena,* 869 P.2d 932, 935 (Utah 1994). And finally, section 59–2–1007 contains no explicit grant of discretion to the Commission. Thus section 59–1–610(1)(b) demands that we review the Commission's conclusion under a correction of error standard.

In applying *Kennecott*'s strictures to the present case, we note that section 59–2–1007(3) contains no negative words denying the exercise of power if decisions have not been issued by October 1. More importantly, the statutory language makes clear that the time of performance is not essential to the statute's purpose. The "essence of the thing to be done" is not compliance with the statute's time frames; rather, the "essence" of the statute is that the Commission provide an avenue through which dissatisfied counties or taxpayers can challenge property tax assessments. Although the issuance of written decisions prior to October 1 is preferable, it is more important that challenges to assessments are heard in a meaningful way.

In addition, no prejudice occurred to "those whose rights are protected [by section 59–2–1007(1)–(3)]" due to the Commission's failure to meet the October 1 deadline. An

examination of the statutory language reveals that these subsections were meant to preserve an affected taxpayer's or county's right to appeal a property tax assessment performed by the Commission. Thus, the Counties' claim that they were prejudiced by a consequent inability to accurately budget revenues is unavailing because the Counties did not challenge the initial assessment. Rather, the Counties endeavored to preserve the initial assessment and are therefore not a protected class under this part of the statute.

But even if the Counties did fall within a protected class under the relevant portion of the statute, they were not prejudiced to the extent necessary to view section 59–2–1007(3) as mandatory. Counties must expect, as is obvious from this case, that initial property tax assessments, especially those of large utility systems, are subject to challenges, and these challenges are likely to arouse the disapproval of parties satisfied with the initial assessment. Furthermore, dissatisfied parties may seek review of the Commission's ultimate resolution. All of these procedural tumults preclude a final resolution between the time an appeal must be commenced, June 1, and October 1 of the same year, a span of only four months. Faced with this reality, it would seem folly for any county to overly rely upon assessments that seem likely to provoke controversy. Likewise, it is not surprising that the revenues counties receive, and therefore the budgets counties prepare, may be subject to a degree of instability; such is the natural consequence of a statutory scheme affording all affected parties a meaningful opportunity to voice grievances and seek relief.

On the other hand, if we were to hold section 59–2–1007(3) mandatory, thereby divesting the Commission of jurisdiction over appeals not timely resolved, challengers of initial Commission assessments would be substantially prejudiced. Challengers who complied with all administrative rules would be denied a statutorily guaranteed forum to challenge initial assessments solely because *the Commission* delayed a ruling.[3] Thus, whereas construing section 59–2–1007(3) as merely directory would cause little prejudice to any affected party, construing that section as mandatory would cause substantial hardship for challengers, the protected class under the relevant portion of section 59–2–1007. Consequently, section 59–2–1007(3)'s time designation can be viewed only as a guide, "given with a view merely to the proper, orderly and prompt conduct" of the Commission's business. We hold that the Commission's failure to meet the October 1 deadline did not result in loss of jurisdiction over PacifiCorp's appeal.

■ The second issue is whether the Commission improperly refused to compel PacifiCorp to comply with Emery County's discovery requests. Emery County contends that as intervenor, it was entitled to information under PacifiCorp's control that was not provided to the Division. PacifiCorp and the Commission respond, first, that Emery County had all of the information necessary because it had access to the same information the Division had and, second, that at the time of Emery County's discovery requests, a revised assessment was pending and, if approved, would make additional discovery unnecessary. We find that the Commission correctly denied Emery County's discovery requests, but for a different reason than those offered by PacifiCorp and the Commission.

■ Under Utah law, discovery is generally governed by the Utah Rules of Civil Procedure. However, "administrative proceedings are not subject to the Utah Rules of Civil Procedure unless the governing statute or regulations so provide." *Pilcher v. Department of Social Servs.*, 663 P.2d 450, 453 (Utah 1983). Hence, discovery in administrative proceedings is available only if governing statutes or agency rules so provide. 2 Am.Jur.2d *Administrative Law* § 327 (2d ed.

---

**3.** This fact alone distinguishes this case from those cited by the Counties, such as *Maverik Country Stores, Inc. v. Industrial Commission*, 860 P.2d 944 (Utah Ct.App.1993), and *Silva v. Department of Employment Security*, 786 P.2d 246 (Utah Ct.App.1990) (per curiam). In these cases, the party prejudiced by the tribunal's loss of jurisdiction was to blame. *See Maverik Country Stores*, 860 P.2d at 950 (appellant filed request for review of order one day late); *Silva*, 786 P.2d at 247 (same).

1994) ("[A]ny right to discovery is grounded in the procedural rules of the particular agency."); 73A C.J.S. *Public Administrative Law and Procedure* § 124 (1983) ("Insofar as the proceedings of a state administrative body are concerned, only the methods of discovery set forth in the pertinent statute are available, and methods not set forth therein are excluded." (footnotes omitted)).

Under the Utah Administrative Procedures Act, an agency may promulgate rules governing discovery for formal adjudicative proceedings. Utah Code Ann. § 63–46b–7(1). Pursuant to this statute, the Commission promulgated rule 861–1A–6 of the Utah Administrative Code, to govern discovery in Tax Commission adjudications. Rule 861–1A–6, however, contemplates discovery only from the Commission, not from the taxpayers. For example, the policy behind the rule is stated as follows:

> It is the policy of the Commission, and its various divisions, to disclose fully to parties appearing before it the legal basis and nature of the claim, charge, or assessment involved and the facts upon which the Commission relies, to the degree that such disclosure is not prohibited by law or is not confidential information.

Utah Admin.Code R861–1A–6.A. Plainly, the policy of the Commission is to provide parties access to only the information it relied upon. The Commission's policy to allow discovery only of information within its control is also exemplified by subsection C of rule 861–1A–6. That subsection states:

> [I]f a party feels that he has not been able to make sufficient discovery through departmental conferences and other informal procedures, he may petition the Commission for permission to utilize the discovery devices set forth in the Utah Rules of Civil Procedure.

Under this section, parties should be able to obtain necessary information through "departmental conferences and other informal procedures." Only the Commission could provide information in such an informal manner; discovery of information from taxpayers could not be accomplished through "depart-mental conferences and other informal procedures." This further evinces the Commission's policy to limit the source of information to itself.

Under Utah law, discovery in formal agency adjudications is available only if an applicable statute or rule so provides and only to the extent provided in the applicable statute or rule. Although rule 861–1A–6 provides a means for discovery, the rule contemplates discovery only of information within the control of the Commission.[4] Because Emery County's discovery requests sought information from PacifiCorp but not from the Commission, its discovery requests were properly rejected.

The next issue is whether the Commission's approval of the revised settlement is consistent with generally accepted appraisal methods and the Commission's statutory guidelines. The Counties challenge three of the Commission's findings. The first finding is that the use of an annual average stock price rather than a year-end stock price under the stock and debt and income indicators is consistent with proper appraisal methodology and the statutory mandate that the Commission value property for tax purposes as of January 1 of each tax year. *See* Utah Code Ann. § 59–2–201(1). According to the Counties, the use of an annual average stock price violated the mandate because, as PacifiCorp's stock rose steadily in value throughout 1991, the Commission, in effect, valued PacifiCorp's utility operations as of July 1, 1991.

The second finding the Counties challenge is that weighting the cost indicator of value over the stock and debt indicator was consistent with proper appraisal techniques. This finding is erroneous, argue the Counties, because a nonmarket indicator such as the cost indicator should never be given more significance in an appraisal than a market indicator such as the stock and debt indicator.

Finally, the Counties attack the Commission's finding that the original assessment was unsound because in allocating PacifiCorp's stock to its utility operations, the Division used incompatible information from

---

4. Rule 861–1A–6 has not been challenged by any party as violative of its enabling statute, section 63–46b–7 of the Utah Code, or the Utah or United States Constitution.

PacifiCorp's financial and regulatory reports. The Counties contend that the original valuation's use of figures from both PacifiCorp's regulatory and financial reports was appropriate because the use of information from the two sources did not cause an inaccurate result.

■ PacifiCorp and the Commission respond that the Counties' challenges amount to attacks upon the Commission's findings of fact. Therefore, respondents argue, this court, affording deference to the Commission's fact-finding expertise, must apply "a substantial evidence standard on review." Utah Code Ann. § 59–1–610(1)(a). Under such a standard, we must uphold the Commission's findings of fact if the findings "are supported by substantial evidence based upon the record as a whole." *Zissi v. State Tax Comm'n*, 842 P.2d 848, 852 (Utah 1992). Respondents further argue that the Commission's findings are supported by substantial evidence, namely, the testimony and affidavit of Mr. Eyre, assistant director of the Division and an expert in the field of appraisal.

■ The first question is whether the challenged findings are appropriately deemed findings of fact. A finding is not necessarily a finding of fact simply because a tribunal says it is. A factual finding may be contrary to law and must therefore be stricken even if it is supported by substantial evidence. Such is the Counties' contention with regard to its first challenge—that the use of annual average stock prices is inappropriate because it results in moving the lien date from January 1 to July 1 of the previous year, contrary to section 59–2–201(1) of the Utah Code.

However, there is a great difference between the technique the Commission approved and the unlawful result the Counties contend. The Commission did not move the lien date from January 1 to July 1 of the previous year. Rather, the Commission valued PacifiCorp's stock using an annual average approach, which happened to yield a price which coincided with PacifiCorp's stock price in July. This is because PacifiCorp's stock had steadily risen in price during the year. At most, the Counties can argue that the Commission, in effect, moved the valua-

tion date of PacifiCorp's stock back to July 1. This is different than moving back the statutory lien date. The stock price is relevant only for the stock and debt indicator and the capitalization rate used in the income indicator of value. The cost indicator was unaffected.

In addition, the use of annual average stock prices is sometimes necessary to satisfy the statutory requirement that property be assessed "at 100% of fair market value." Utah Code Ann. § 59–2–201(1). " 'Fair market value' means the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts...." *Id.* § 59–2–102(8). If artificial conditions cause a sharp increase in PacifiCorp's stock price, a buyer with knowledge of the relevant facts would be unwilling to acquire PacifiCorp on that basis. One expert articulated the problem this way:

> "Anyone [who] is familiar with the [stock] market knows that it's quite a herd instinct, that buyers of common stock if they see a stock moving rapidly on the upside, they'll say to themselves, 'someone knows something so I better buy some of it, and it goes up....' So the problem then becomes how do you get a realistic value of the total common stock that's owned by a corporation."

*Utah Ass'n of Counties v. Tax Comm'n*, 895 P.2d 825, 828 (Utah 1995) (alterations in original) (quoting record). To satisfy its obligation to determine fair market value, or a "realistic value," of PacifiCorp's stock, the Commission accepted the use of an annual average approach rather than relying on the stock price on one particular date, which could be based on nothing more than "herd instinct." We therefore conclude that the Commission did not violate section 59–2–201(1) by approving the use of annual average stock prices. The approval is more appropriately deemed a factual finding which will be upheld if supported by substantial evidence.

■ The remaining challenged findings are also properly characterized as findings of

fact. The second finding—that the weighting of one indicator of value over another was consistent with proper appraisal techniques—has appeared before this court in similar form in the past. In each case, this court has treated the finding as one of fact. *See Utah Ass'n of Counties,* 895 P.2d at 827–28; *Questar Pipeline Co. v. Utah State Tax Comm'n,* 850 P.2d 1175, 1177–78 (Utah 1993). *Utah Association of Counties* is particularly relevant. In both that case and the present one, a group of counties contended that the stock and debt indicator of value was undervalued during the reconciliation of the applicable indicators. In *Utah Association of Counties,* the Tax Commission opted to reject the stock and debt indicator altogether. *Utah Ass'n of Counties,* 895 P.2d at 827. We found the Commission's rejection supported by substantial evidence and therefore upheld the Commission's actions. *Id.* at 828. We will do the same in this case—if the propriety of PacifiCorp and the Division's weighting scheme is supported by substantial evidence, we will uphold the Commission's approval.

 By analogy, we find the last challenged finding—that the original assessment was unsound because the Division used incompatible information from PacifiCorp's financial and regulatory reports—also to be one of fact. The use of annual average stock prices and the proper weighting of the indicators, which we found to be questions of fact, are matters of appraisal methodology. The proper application of appraisal techniques depends upon varying factual circumstances that defy generalization:

> "[V]aluation is an art, not a science. It is a function of judgment, not of natural law.... [F]or example—true market value for purposes of ad valorem taxation is always an estimate, always an expression of judgment, always a result built on a foundation of suppositions about knowledgeable and willing buyers and sellers endowed with money and desire, whose desires are said to converge in a dollar description of the asset."

*Id.* at 825 (alteration in original) (quoting *Union Pac. R.R. v. State Tax Comm'n,* 716 F.Supp. 543, 554 (D.Utah 1988)). This court recognized this reality in *Questar Pipeline* in responding to a contention that in another case before the Tax Commission, the Commission concluded that an indicator given substantial weight in *Questar Pipeline* was unreliable. *Questar Pipeline Co.,* 850 P.2d at 1178. This court rejected the contention, reasoning that factual differences among the two cases could drastically alter the application of proper appraisal techniques. *See id.* at 1178–79; *see also Utah Power & Light Co. v. Utah State Tax Comm'n,* 590 P.2d 332, 334 (Utah 1979) ("The fact that the Commission has followed a certain procedure in the past does not commit it to do so eternally."). And like the weighting of the indicators of value and the use of annual average stock prices, the proper sources from which information is derived is also a matter of appraisal methodology; it also depends upon varying factual circumstances that defy generalization. Therefore, the propriety of using information from more compatible sources is a question of fact.

However, we decline to determine if substantial evidence supports the Commission's conclusion to accept the use of information from more compatible sources. The Counties do not argue that the use of information from more compatible sources was improper under accepted appraisal practice. Instead, the Counties argue that the original use of regulatory and financial reports was not improper. In short, the Counties argue that the Commission should have adopted the approach, out of two acceptable approaches, that would have afforded more tax revenue to the Counties. The Counties, however, were ordered to "show good cause ... why the assessment should not be adjusted." Utah Code Ann. § 59–2–1007(4)(a). They could do so by showing appraisal errors but not by showing merely that the adjusted assessment, although based upon accepted principles, was lower than the assessment the Counties desired.

 The next question is whether substantial evidence supports the properly challenged factual findings. As challengers, the Counties bear the burden of demonstrating that the factual findings are erroneous. To prevail, the Counties must marshal all of the evidence supporting the findings and

show that despite the supporting facts and in light of the conflicting evidence, the findings are not supported by substantial evidence. *See Zissi,* 842 P.2d at 852; *Cornish Town v. Koller,* 758 P.2d 919, 922 (Utah 1988); *Grace Drilling Co. v. Board of Review,* 776 P.2d 63, 68 (Utah Ct.App.1989). " 'Substantial evidence' is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank v. County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990).

■ The first finding—approving the use of annual average stock prices to determine the stock and debt indicator and the capitalization rate for the income indicator—is supported by substantial evidence. PacifiCorp and the Division's expert testified that an annual average stock price is preferable to a price on a particular date:

> [M]ost appraisers feel that you should use some type of normalized price and there are [sic] a wide gambit [sic] as to what type of time frame you should look at in determining a normalized price. There [sic] probably as many appraisers who feel that an annual average ... is ... normalizing as there are those who feel you should look at something closer to the [lien] date.

In addition, the Division and PacifiCorp pointed out that the Commission had approved the use of annual average stock prices in a recent case, *Union Pacific Railroad Co. v. Property Tax Division of the State of Utah Tax Commission,* Appeal No. 89–0967. The Counties' expert, Mr. Prawitt, testified that the use of annual average stock prices is impermissible because such use moves the statutory lien date back from January 1 to July 1 of the previous year. Because we have already rejected this contention and because we find that the Commission's finding is based upon substantial evidence provided by Mr. Eyre, we uphold this finding of fact.

■ The second finding—approving the Division's weighting of the three indicators— was also attacked by Mr. Prawitt. He testified that the settlement assessment gave a weight of fifty percent to the income indicator, thirty percent to the cost indicator, and only twenty percent to the stock and debt indicator. According to Mr. Prawitt, a weighting scheme that gave the stock and debt indicator less significance than the cost indicator was contrary to proper appraisal methodology: "It doesn't make sense to me. The cost indicator is not a market indicator of value, while the income and stock indicators are, yet more weight is given to the cost indicator then [sic] one of the market indicators." In response, Mr. Eyre testified that Mr. Prawitt erroneously determined that the cost indicator was weighted over the stock and debt indicator. Mr. Eyre testified that all that could be said of the revised assessment's weighting scheme was that primary weight was given to the income indicator and secondary weight was given to the stock and debt and cost indicators. Moreover, Mr. Eyre testified that the weighting of the indicators is very subjective and that the weighting of the revised assessment was consistent with accepted appraisal techniques.

The Counties have failed to satisfy their burden of showing that the Commission's finding is not supported by substantial evidence. Instead, the Counties have inaccurately characterized the revised assessment's weighting scheme and attacked the conjured scheme. Nowhere did the Commission, or PacifiCorp or the Division for that matter, approve the weighting scheme which the Counties allege the revised assessment employed. The Commission's findings were actually quite different. Referring to the Counties' arguments, including its contentions concerning the weighting of the indicators, the Commission found that the arguments "highlight differences in appraiser judgment, but do not establish a misapplication of generally accepted appraisal theory in deriving fair market value of PacifiCorp for the 1992 assessment year." What the Commission did find—that giving the income indicator primary significance and the stock and debt and cost indicators secondary significance is consistent with generally accepted appraisal theory—was supported by substantial evidence provided by Mr. Eyre. Therefore, we uphold this factual finding.

■ The next issue is whether the Commission correctly assigned to the Counties

the burden of showing that the revised assessment should not be adopted. The Counties argue that PacifiCorp should have carried the burden of proof at the show cause hearing because it petitioned for a redetermination of the original assessment. Under rule 861–1A–7G. of the Utah Administrative Code, "[t]he petitioning party shall have the burden of proof to establish that his petition should be granted." In addition, the Counties point out that in *Utah Power & Light Co. v. Utah State Tax Commission*, 590 P.2d 332, 335 (Utah 1979), this court stated:

> [W]here the taxpayer claims error, it has an obligation, not only to show substantial error or impropriety in the assessment, but also to provide a sound evidentiary basis upon which the Commission could adopt a lower valuation.

At the time of the hearing, argue the Counties, the Commission had not approved the assessment agreed upon by the Division and PacifiCorp and, as a result, the original assessment should have been presumed correct until PacifiCorp demonstrated otherwise.

The Commission and PacifiCorp respond that the Counties properly bore the burden of showing that the revised assessment should be rejected. The Commission and PacifiCorp contend that by convincing the Division to alter its original assessment, PacifiCorp satisfied its burden. Then, the argument continues, under section 59–2–1007(4)(a), the burden shifted to the Counties "to show good cause ... why the assessment should not be adjusted" in the manner provided in the revised assessment.

■ Because the allocation of burdens of proof is a question of law, *see Halladay v. Cluff*, 685 P.2d 500, 506–07 (Utah 1984) (granting no discretion to the trial court's allocation of the burden of proof), and section 59–2–1007 does not "explicit[ly] grant discretion," we must "grant the commission no deference ..., applying a correction of error standard [of review]." Utah Code Ann. § 59–1–610(1)(b).

We agree with respondents that the Counties bore the burden of persuasion. PacifiCorp satisfied its burden of demonstrating errors in the original assessment and secured the approval of the Commission. By issuing its order to the impacted counties to show cause why the assessment should not be revised, the Commission evidenced its approval of the revised assessment. If it did not approve the adjustments, the Commission should not have issued its order. Section 59–2–1007 conditions issuance of an order to show cause upon the *Commission's* proposal to adjust an assessment, not upon the *Division's* proposal. *See* Utah Code Ann. § 59–2–1007(4)(a). Hence, the issuance of the order to show cause evidenced PacifiCorp's satisfaction of its burden of demonstrating errors in the initial assessment.

The next step in the procedure under section 59–2–1007 is that the impacted counties must show cause why proposed adjustments to an assessment should be rejected:

> If the commission proposes to adjust an assessment which was made pursuant to Section 59–2–201, the commission shall furnish notice ... of its intent to adjust the assessment to the county auditor of any county whose tax revenues may be affected by the decision.... *The notice shall request the county to show good cause, within 30 days from the postmarked date of the notice, why the assessment should not be adjusted....*

*Id.* § 59–2–1007(4)(a) (emphasis added). The clear import of this subsection is that the Counties bear the burden of making a good cause showing. In sum, PacifiCorp had convinced the Commission that the original valuation should be reduced, and the burden then shifted to the Counties to dispute the reduction. Therefore, we find that the Commission properly allocated the burden of persuasion to the Counties.

■ The final issue is whether the Commission properly defined a "good cause" showing under section 59–2–1007(4) of the Utah Code as a demonstration that the revised assessment contained a material mistake of fact or law. In pertinent part, section 59–2–1007(4)(a) provides:

> If the commission proposes to adjust an assessment ... [it] shall furnish notice ... of its intent ... to ... any county whose tax revenues may be affected by the decision.... The notice shall request the

county to show *good cause* ... *why the assessment should not be adjusted....* (Emphasis added.) The Counties contend that to show good cause under this section, they only had to "allege or state the reasons for their challenge to the Division's assessment" and the reasons should be reasonable "in the sense of being logically or rationally related to fair market value." PacifiCorp responds that the Commission correctly defined "good cause" to mean a material mistake of fact or law.

■■■■■ " 'The primary role of statutory interpretation is to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve.' " *Sullivan v. Scoular Grain Co. of Utah*, 853 P.2d 877, 880 (Utah 1993) (quoting *Reeves v. Gentile*, 813 P.2d 111, 115 (Utah 1991)). The best indicator of that intent is the plain language of the statute. *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993). Also, "[a] general rule of statutory construction is that a statute should be construed as a comprehensive whole." *Zissi*, 842 P.2d at 854. Because an issue of statutory construction presents a question of law, *see Pena*, 869 P.2d at 935, and section 59–2–1007 does not "explicit[ly] grant·discretion," we must "grant the commission no deference ..., applying a correction of error standard [of review]." Utah Code Ann. § 59–1–610(1)(b).

According to its terms, section 59–2–1007(4)(a) was enacted to afford counties whose tax revenues may be affected by proposed assessment adjustments a means to challenge proposed adjustments and possibly prevent the adjustment from becoming effective. The legislature, however, intended that counties must do more than simply come forward to protest an adjustment. "Good cause" must be shown. Utah Code Ann. § 59–2–1007(4)(a). And although the legislature did not define "good cause," it did provide that a successful showing of good cause could lead to dramatic results.

If a county decides to object to an adjustment and attempts to demonstrate good cause, "the commission shall hold a hearing or take such other action as it considers appropriate to consider the good cause alleged by the county *and shall then issue a*

*written decision increasing, lowering, or sustaining the assessment with respect to such county.*" Utah Code Ann. § 59–2–1007(4)(b) (emphasis added). Thus, if a county successfully demonstrates good cause, this subsection demands that the Commission adjust the assessment accordingly. This could include increasing a revised assessment with respect to that county.

The fact that a successful good cause showing can have such a dramatic effect militates in favor of a more stringent standard than the one proposed by the Counties. The legislature clearly did not intend that a county could increase an assessment by merely "alleg[ing] or stat[ing] the reasons for its challenge." What is required is that a county show that the revised assessment contains an error. The error, however, must have had an effect on the assessment, meaning that but for the error, the valuation would have been higher or lower. In other words, the error must be material. A county should not be able to cause the Commission to increase its revised assessment by showing an *im*material error. In addition, as long as the error is material, the error may be of any type—the county may show that the assessment is contrary to the facts or violates applicable law. In other words, a county may show "good cause" by demonstrating a material error of fact or law. Because our reasoning leads to the same definition of "good cause" as the definition adopted by the Commission, we hold that the Commission did not err in applying that definition to weigh the Counties' objections.

### III. CONCLUSION

We conclude that (1) the Commission did not lose jurisdiction over PacifiCorp's appeal by failing to issue a written decision by the statutory deadline; (2) the Commission did not unduly restrict Emery County's discovery; (3) the Commission's challenged factual findings are either supported by substantial evidence or inappropriately challenged; (4) the Commission properly placed the burden of proof on the Counties; and (5) the Commission correctly determined that the Counties must show that the revised assessment

contained a material mistake of fact or law to prevail. We therefore affirm.

ZIMMERMAN, C.J., DURHAM, J., and TIMOTHY R. HANSON, District Judge, concur in Justice RUSSON's opinion.

HOWE, J., concurs in the result.

Having disqualified himself, STEWART, Associate C.J., does not participate herein; TIMOTHY R. HANSON, District Judge, sat.