UTAH ASSOCIATION OF COUNTIES, a Utah nonprofit corporation, and Beaver, Box Elder, Cache, Carbon, Davis, Emery, Grand, Iron, Juab, Millard, Morgan, Rich, San Juan, Sanpete, Salt Lake, Summit, Tooele, Utah, Washington, and Weber Counties, political subdivisions of the State of Utah, Petitioners,

v.

TAX COMMISSION OF the STATE OF UTAH ex rel. AMERICAN TELEPHONE & TELEGRAPH CO., Interstate Division, and AT & T Communications of the Mountain States, Inc., Respondents.

Nos. 930451, 930531.

Supreme Court of Utah.

March 24, 1995.

Rehearing Denied April 17, 1995.

Bill Thomas Peters, Salt Lake City, for petitioners.

Jan Graham, Atty. Gen., Brian L. Tarbet, Kelly W. Wright, Asst. Attys. Gen., Salt Lake City, for Tax Com'n.

Robert A. Peterson, Salt Lake City, and Anna P. Winsett, Basking Ridge, NJ, and

Paul J. Mooney, Fennemore Craig, Phoenix, AZ, for AT & T.

HOWE, Justice:

The Utah Association of Counties ("UAC") and twenty Utah counties seek review of a decision of the Utah State Tax Commission ("Commission") assessing the fair market value of the operating property of American Telephone and Telegraph Company–Interstate Division and AT & T Communications of the Mountain States, Inc. (collectively "AT & T–C"), at $15,038,371,189 for 1990. Of that amount, $149,030,258 was allocable to Utah.

## BACKGROUND

AT & T–C is a long distance telecommunications provider which is regulated by the Federal Communications Commission ("FCC"). It is considered a dominant carrier and is currently subject to price cap regulation by the FCC, which limits the rates AT & T–C may charge for its services.

In April 1990, the Property Tax Division of the Commission assessed the taxable properties of AT & T–C at $24 billion as of the lien date of January 1, 1990. AT & T–C protested this valuation and petitioned for a hearing and redetermination of the assessment. The Commission held a nine-day hearing at which both the Division and AT & T–C presented expert testimony and their respective appraisals concerning the fair market value of AT & T–C's property for the purposes of assessing an ad valorem tax. The Commission arrived at its own valuation of $15,038,-371,189. UAC and the counties seek review.

## UAC'S STANDING

The Commission challenges UAC's standing to petition for review. It argues that (1) UAC failed to properly intervene in the hearing before the Commission, and (2) it lacks the traditional standing criterion that it will suffer a distinct and palpable injury, affording it a stake in the outcome. *See Terracor v. Utah Bd. of State Lands & Forestry,* 716 P.2d 796, 799 (Utah 1986).

Unfortunately, it is unclear whether UAC properly intervened in the hearing.[1] Although the counties submitted a formal motion to intervene at the request of the Commission, it was not acted upon. UAC did not join in that motion, but its counsel, who was also representing the counties, actively participated throughout the entire hearing, including regular examination of witnesses with the permission of the Commission. At no time did the Commission or AT & T–C object to UAC's participation. We therefore find that the Commission has waived its right to challenge UAC's participation in this review. UAC adequately intervened in the hearing below on a de facto basis. *See Schulz, Davis & Warren v. Marinkovich,* 203 Mont. 12, 661 P.2d 5, 8 (1983).

We next examine UAC's standing before this court. The right of a party to intervene in an administrative hearing is different from standing to obtain judicial review. *See RAM Broadcasting of Colorado, Inc. v. Public Utils. Comm'n,* 702 P.2d 746, 749 (Colo.1985); *Blackstone Valley Chamber of Commerce v. Public Utils. Comm'n,* 452 A.2d 931, 934 (R.I.1982). Associations have standing when "'(i) the individual members of the association have standing to sue, and (ii) 'the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause.'" *Society of Prof. Journalists v. Bullock,* 743 P.2d 1166, 1175 (Utah 1987) (quoting *Utah Restaurant Ass'n v. Davis County Bd. of Health,* 709 P.2d 1159, 1163 (Utah 1985)). As to the first prong, there is no question that UAC's members, the individual counties, have standing inasmuch as the Commission's findings directly affect the amount of tax revenue the counties receive. There is no problem as to the second prong: the counties moved to

---

1. The procedural posture of this case is somewhat unusual. The Property Tax Division is part of the Utah State Tax Commission. The Utah Attorney General defended the Division's appraisal at the Commission hearing against AT & T–C's challenge. UAC was allied with the Division during the proceedings below. However, on review in this court, the Division is no longer participating, and the Attorney General now represents the Commission, allied with AT & T–C, against UAC.

intervene and were represented in their own capacity at the Commission hearing, although their appearance may not have been necessary. *See Millard County v. Utah State Tax Comm'n*, 823 P.2d 459, 463 (Utah 1991) (allowing Commission to have one agency intervene and represent multiple political subdivisions to avoid undue burden). It is also clear that UAC is aggrieved by the Commission's ruling adverse to it. We therefore conclude that UAC has standing to petition for review and is an appropriate party to this case. Hereinafter, we shall refer to the counties and UAC collectively as UAC.

### STANDARD OF REVIEW

◼ Under the Utah Administrative Procedures Act, we are required to uphold an agency's findings when they are supported by "substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63–46b–16(4)(g) (superseded by § 59–1–610(1)(a)); *Board of Equalization v. Sinclair Oil*, 853 P.2d 892, 892 (Utah 1993); *Questar Pipeline Co. v. Utah State Tax Comm'n*, 850 P.2d 1175, 1176 (Utah 1993). We have defined "substantial evidence" as "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *U.S. West Communications, Inc. v. Public Serv. Comm'n*, 882 P.2d 141, 146 (Utah 1994) (citing *Boston First Nat'l Bank v. Salt Lake County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990)). It is not our prerogative on review to reweigh the evidence. Instead, we defer to the Commission's findings because, when reasonably conflicting views arise, it is the Commission's province to draw inferences and resolve these conflicts. *Grace Drilling v. Board of Review*, 776 P.2d 63, 68 (Utah Ct.App.1989).

### ANALYSIS

◼ It is the responsibility of the Commission to determine the "fair market value" of the subject property as that term is defined by statute:

"Fair market value" means the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

Utah Code Ann. § 59–2–102(7); *Questar*, 850 P.2d at 1176.

In its findings of fact, the Commission summarized the respective positions of the key expert witnesses on both sides. AT & T–C's expert, Dr. Arthur A. Schoenwald, appraised the subject property using the cost and income indicators of value.[2] First, under the income approach, Dr. Schoenwald used a yield capitalization method and, then, through a series of sophisticated calculations, estimated the value of AT & T–C's property at $13,533,184,000.[3] Second, under the cost approach, Dr. Schoenwald assessed the property at $13,418,959,000. Through the process of "correlation"—quantifying the quality of the two indicators in terms of applying a weight or "confidence level" to each—Dr. Schoenwald gave two-thirds weight to the income approach and one-third to the cost approach. This resulted in a final valuation of $13,495,109,000, of which $133,737,000 was allocable to Utah.[4]

The Division's expert, Eckhardt A. Prawitt, also employed the cost and income approaches to value but, in addition, included

---

2. The "cost indicator of value" is the cost of the property less the amount of depreciation incurred plus any improvements since the acquisition. The "income indicator of value" is more complicated. It may be described as "any method that converts future anticipated income into present value. It is premised on the assumption that investors will buy and sell property based on the income it is expected to provide its owners over time." Eckhardt A. Prawitt, *Valuation and Apportionment of Utilities and Railroads in the State of Utah* (May 16, 1991) [hereinafter Prawitt].

3. "Yield capitalization is a method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate or by developing an overall rate that explicitly reflects the investment's income pattern, value change, and yield rate." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 420 (10th ed. 1992).

4. The parties at the hearing basically agreed as to the appropriate Utah allocation factor. AT & T–C's allocation factor was .9910%, while the Division/UAC's was .9755%. The correct allocation factor is not an issue on review.

the stock and debt approach.[5] First, under the income approach method, he did not use yield capitalization as Dr. Schoenwald did, but rather, used a direct capitalization method.[6] Mr. Prawitt estimated the normalized income stream at $1.9 billion. Consequently, through a series of calculations, his income approach resulted in a value of $24,695,546,-639. Second, under the stock and debt approach, he arrived at two estimations: $25,-465,000,000 and $23,926,000,000. Third, under the cost approach, he also arrived at two estimations: $15,913,751,697 and $14,297,-443,575. Through his own process of correlation, Mr. Prawitt reached his final appraisal of the subject property of $24 billion, $234,-120,000 of which was allocable to Utah.

The Commission made six pivotal findings: (1) Due to the price cap regulatory scheme imposed upon AT & T-C by the FCC, limits exist on its potential earnings. This in turn affects the fair market value of the subject property. (2) For the Division's direct capitalization method of valuation to work properly, it is critical that comparable properties are factored in. Mr. Prawitt's selection of comparable properties and the necessary adjustments made to them to approximate the subject property were unsatisfactory. (3) In view of the specific facts of this case, the use of the stock and debt indicator was inappropriate because Mr. Prawitt failed to account for intracompany transactions and his stock price estimate was too high. (4) Dr. Schoenwald's use and implementation of the yield capitalization method was more accurate, although the income-stream component was fundamentally flawed as it was based on the old rate base regulation rather than on the current price cap regulation of the FCC. (5) The income stream of Mr. Prawitt was more appropriate as it captured the overall income corrections. By adopting Mr. Prawitt's net operating income stream ($1.9 billion) and capitalizing it by Dr. Schoenwald's yield rate (12.75%), the Commission fixed the most rea-sonable value of the subject property at $14,-901,960,784. (6) The Commission had originally failed to correctly adjust for construction work in progress ("CWIP") and thus added $136,410,405 to its previous valuation to reach the final fair market value of $15,-038,371,189.

We have carefully reviewed the evidence from the hearing to determine whether each of these findings is supported by substantial evidence.[7] We examine each finding in order.

(1) There was evidence that the current price cap regulation imposed by the FCC on AT & T-C causes restrictions on earnings, which in turn adversely affects the fair market value of AT & T-C. Peter K. Pitsch, an attorney and expert on FCC regulation, testified that price cap regulation was not deregulation and that the FCC would assure that AT & T-C maintained reasonable rates and would not earn excessive profits. Dr. Schoenwald testified that such restriction should be considered in an appraisal of AT & T-C's operating property.

(2) To properly function, the direct capitalization method employed by the Division must include the factoring of companies comparable to AT & T-C. In addition, constant adjustments must be made to further align them to AT & T-C. Expert witnesses attested that AT & T-C is unique, mainly because it is the only telecommunications company that is regulated. Dr. Schoenwald testified that the necessary and accurate adjustments of the comparable companies were simply not done by the Division. He further compared the same companies the Division used in its appraisal with AT & T-C and concluded that with correct adjustments, the direct capitalization method arrives at a valuation figure comparable to his own.

(3) An accurate valuation using the stock and debt method depends upon the ability to

---

5. The "stock and debt indicator" of value is the market value of the utility's common and preferred stock plus the market value of its bonds (or debt). Prawitt, *supra* note 2.

6. This method determines the value of the property by dividing the net operating income by a capitalization rate and then adding the amount which represents long-term construction work in progress. Prawitt, *supra* note 2.

7. Throughout the hearing, the Commission heard nine full days of testimony and received 106 exhibits. The expert testimony constituted over 2,300 pages of transcript.

correctly determine the amount of value attributable to AT & T–C. In this instance, the Division, through its appraiser, Mr. Prawitt, used a weighted annual and fourth quarter average of the stock price of the parent company of $40 per share. Both sides agreed that the annual average of the stock price was $37.05 per share. The Commission decided that the Division's share price determination was too high because it considered share prices after the lien date of January 1, 1990.

Dr. Schoenwald testified that the necessary data for a proper stock and debt approach was lacking:

Q. I don't find any stock and debt market approach in your appraisal report. Is there a reason for that?

A. Yes, sir.

Q. What is it?

A. Based on some experience when I first began work for AT & T in 1986, I now know it is impossible to do a stock and debt based on the information available at the parent company level, because the information that we would need would have to divide up the company so that each business segment could be seen as it contributes to the whole. *And you would need all of the elimination entries and all of the intercompany transactions to attempt to get the individual pieces to add up to the whole. The company does not have that information available by business unit.*

(Emphasis added.)

(4) As mentioned, Dr. Schoenwald used a yield capitalization approach under its income indicator of value. This rate was based on a stipulated capital structure of AT & T–C of 70% equity and 30% debt. However, both sides calculated a different yield rate within this approach, and this overall rate was the subject of more disagreement than any other issue during the entire hearing. Dr. Schoenwald calculated a yield rate of 12.75% compared to the Division's rate of 12.22%.

Dr. Schoenwald supported his calculation of 12.75% by demonstrating four separate techniques to determine what rate of return on equity would be required by anyone investing in AT & T–C. Through this complicated series, Dr. Schoenwald (i) compared the FCC's last determination of the cost of equity capital for AT & T–C with that of the Regional Bell Operating Companies, (ii) analyzed the cost of equity capital using a well-recognized mathematical calculation, the risk premium model, (iii) calculated the cost of equity capital using another standard technique, the capital asset pricing model, and (iv) examined the historical premium on equity using credible published tables. These calculations afforded Dr. Schoenwald one of the critical figures needed for his income indicator formula.

(5) In determining the other critical figure, the income indicator or income stream, the Commission rejected Dr. Schoenwald's numbers and adopted those of the Division. Dr. Schoenwald's income indicator was premised somewhat on rate base regulation rather than on price cap regulation, and therefore, the Commission saw the estimate as outdated and too conservative. Mr. Prawitt, testifying for the Division, determined an income indicator based on calculations of net operating income. By averaging several income streams over a period of time and using data available in publicly accessible documents, he arrived at an income stream of $1.9 billion.

Evidence was presented supporting both the adoption of Dr. Schoenwald's yield capitalization and the Commission's use of Mr. Prawitt's income stream. Not surprisingly, each side during the hearing argued that the income stream figures ultimately embraced by the Commission were either too high or too low. The proffered amounts for income streams ranged from $1.5 billion to $2.6 billion. With its expertise, the Commission had the discretion to adopt a figure that fell somewhere between those polarized estimates. Therefore, substantial evidence supported the Commission in capitalizing the $1.9 billion income indicator by the 12.75% rate to initially arrive at a total valuation of AT & T–C's operating property of $14,901,-960,784.

(6) Following the Commission's initial order, the Division and UAC jointly petitioned for redetermination, alleging that the Com-

mission had failed to fully include the value for CWIP. Utah law requires that *all* property not otherwise exempt be included in the fair market value for ad valorem assessment, and this includes CWIP. Utah Code Ann. § 59–2–201(1)(b); Utah Admin.Code R884–24–20P.

Wayne Henderson, an expert economics analyst, testified that 80.5% of AT & T–C's capital expenditures were made to replace obsolete equipment and technology and maintain the existing income stream. He then testified that 19.5% represented growth opportunities. Also, the Division concluded that the long-term CWIP of AT & T–C amounted to $699,540,539. In amending its order, the Commission, on the basis of this evidence, simply multiplied the Division's long-term CWIP figure by Henderson's 19.5% of growth to arrive at $136,410,405. This was added to the previous value of $14,901,960,784 to reach the final valuation of $15,038,371,189, $149,030,258 of which was allocable to Utah. Pursuant to the preceding evidentiary analysis, we conclude that the Commission's findings are supported by substantial evidence.

UAC assails certain other of the Commission's findings, charging that they are erroneous, resulting in the Commission arriving at a value which is substantially below the full cash value of AT & T–C's properties, in contravention of Utah Constitution article XIII, sections 2 and 3 and Utah Code Ann. § 59–2–103(1), which require that all taxable properties be assessed at their full cash value. First, UAC asserts that the Commission adopted the yield capitalization rate utilized by Dr. Schoenwald in his income model and that his income indicator is a product of rate base. That was error, UAC continues, because AT & T–C was subject to price cap regulation which is "incentive" and not rate of return (rate base) regulation. There is no evidence that the calculation of the yield capitalization rate was dependent on the form of regulation which AT & T–C is subject to by the FCC. None of the witnesses who testified based their determination of the appropriate yield rate on "rate base theory." UAC has not cited anything in the voluminous record to support its assertion.

Second, UAC contends that the yield capitalization model used by Dr. Schoenwald and adopted by the Commission does not include any provision for growth. We disagree. AT & T–C presented extensive testimony and exhibits showing that Dr. Schoenwald's income model was, in fact, a growth model and allowed for inflation and growth. This testimony was independently corroborated by Dr. Hal B. Heaton, a second expert on financial theory.

Third, UAC charges that the Commission commingled two distinct appraisal methods. It took Mr. Prawitt's income stream calculation and applied it to the yield capitalization rate espoused by Dr. Schoenwald. We again find no error. Applying a yield capitalization rate to an income stream which represents cash flow, as the Commission did, is entirely consistent with the evidence presented. The Commission had ample evidence from which to choose in making its selection as to the appropriate level of income to be capitalized. UAC benefits from the Commission's adoption of Mr. Prawitt's income stream calculation, which was higher than that estimated by Dr. Schoenwald.

UAC contends that the Commission erred in several other particulars, but again we find no error. UAC complains that the Commission disregarded the stock and debt method of appraising. Dr. Schoenwald testified that the necessary data to use that approach was lacking. Even Mr. Prawitt testified that the stock and debt method was "less reliable." UAC further complains that the Commission did not use stock prices around the lien date. Since the Commission did not rely on the stock and debt method, any error in stock prices would be harmless error. Last, UAC asserts that the Commission did not include the full value of CWIP. We conclude that the Commission valued all of the CWIP as required by its rule 884–24–20P when, after a petition for reconsideration was filed by the Division and UAC, it added $136,410,405 to its original valuation of AT & T–C's properties to cover CWIP.

Surprisingly, the appraisals of Dr. Schoenwald and Mr. Prawitt differ by approximately $10 billion. The mere fact that two experts, both long trained in the area of valua-

tion, can reach such an immense divergence of opinions is evidence of the nature of tax appraisal. As then Chief Judge Bruce S. Jenkins of the United States District Court for the District of Utah recently observed:

[V]aluation is an art, not a science. It is a function of judgment, not of natural law.... [F]or example—true market value for purposes of ad valorem taxation is always an estimate, always an expression of judgment, always a result built on a foundation of suppositions about knowledgeable and willing buyers and sellers endowed with money and desire, whose desires are said to converge in a dollar description of the asset.

*Union Pac. R.R. v. State Tax Comm'n,* 716 F.Supp. 543, 554 (D.Utah 1988); *see also Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 192 (Utah 1984) (emphasizing that the numerous formulae used to determine market value demonstrate that the term is a judgment call and not subject to mathematical precision). It is with this in mind that we have considered the unenviable responsibility of the Commission to sort out the great volume of evidence and "artistically" reach its valuation.

We affirm the Commission's valuation of AT & T–C's property.

ZIMMERMAN, C.J., DURHAM and RUSSON, JJ., and GREGORY K. ORME, Court of Appeals Judge, concur.

STEWART, Associate C.J., having disqualified himself, does not participate herein; GREGORY K. ORME, Court of Appeals Judge, sat.