BEAVER COUNTY, Box Elder County, Cache County, Davis County, Iron County, Juab County, Millard County, Morgan County, Salt Lake County, Summit County, Tooele County, Utah County, Washington County, and Weber County, Petitioners,

v.

UTAH STATE TAX COMMISSION and Union Pacific Railroad Co., Respondents.

No. 950014.

Supreme Court of Utah.

June 28, 1996.

Bill Thomas Peters, Salt Lake City, for petitioners.

Jan Graham, Att'y Gen., Kelly W. Wright, Asst. Att'y Gen., Salt Lake City, for Tax Commission.

Robert A. Peterson, James D. Douglass, Steven E. McCowin, Salt Lake City, for Union Pacific.

RUSSON, Justice:

Petitioner counties (the Counties) appeal from a ruling of the Tax Commission (the Commission) adopting a revised property tax assessment of Union Pacific Railroad Company's railroad property in Utah for the 1990 tax year. The revised assessment was agreed upon by Union Pacific Railroad Company (Union Pacific) and the Property Tax Division of the Tax Commission (the Division), the division responsible for assessing property for the Commission. We affirm.

## I. BACKGROUND

On April 30, 1990, the Commission sent Union Pacific a notice of assessment, notifying Union Pacific that it had $301,320,000 of taxable railroad property in Utah. On June 1, 1990, pursuant to section 59–2–1007 of the Utah Code, Union Pacific filed a petition for redetermination with the Commission, claiming that the assessment exceeded its fair market value.

While the 1990 petition was pending, the Commission resolved Union Pacific's appeal of the Division's 1989 assessment of Union Pacific's railroad properties. In 1993, using the earlier decision as a guide, the Division and Union Pacific agreed to alter the appraisal methodology of the 1990 assessment.

The negotiations between the Division and Union Pacific centered on the appraisal methods used by the Division in fulfilling its statutory and constitutional responsibility to assess the fair market value, as of the lien date, January 1, of railroad property. See Utah Const. art. XIII, § 11; Utah Code Ann. § 59–2–104. The Division generally employs three recognized approaches or indicators of value—cost, income, and market—if the indicators are applicable to the property under consideration and if reliable information exists to apply the indicators. The cost approach determines property value on the basis of its cost less depreciation. The income approach determines the value of property by, first, determining the reasonable income expected to be earned by the property and, second, capitalizing that income by the return expected to be realized on comparable properties in the market to compute the present value of the anticipated income. The market approach uses the prices at which comparable properties are bought and sold as a basis for determining the value of the property under appraisement. Because railroads such as Union Pacific are rarely bought or sold, the Division uses a surrogate market approach known as the stock and debt approach. Under this indicator, the

market value of a railroad's property is determined by considering the market value of the railroad's common and preferred stock in addition to the market value of its bonds (or debt). Following application of these indicators, the results are reconciled to a single estimate by the Division that is based upon its opinion of the relative applicability, accuracy, and probity of each indicator. Because the indicators are used to appraise the value of all of a railroad's holdings, including property outside Utah, an allocation factor is used to determine the value of the property in Utah. The application of these indicators, in light of the Commission's resolution of Union Pacific's appeal of the 1989 assessment, constituted the subject matter of the negotiations between Union Pacific and the Division.

■ The Division and Union Pacific agreed that in light of the Commission's resolution of the 1989 case, the stock and debt indicator should be altered. One of the modifications to the stock and debt indicator concerned the method of ascertaining Union Pacific's stock price. In the 1989 case, the Division and Union Pacific presented divergent estimates of Union Pacific's value under the stock and debt indicator due to the different methods used by each in establishing Union Pacific's stock price. Union Pacific used an average annual price, while the Division used a year-end stock price. Confronted with the choice of deciding which method was more appropriate, the Commission chose Union Pacific's average annual approach to valuing stock. On the basis of the Commission's choice, the Division agreed to alter its

1990 valuation of Union Pacific's stock using an average annual stock price. This reduced the stock and debt indicator of value by approximately $110 million.[1]

Union Pacific and the Division also agreed to modify the income indicator of value partly on the basis of the 1989 decision. Under the income indicator, the taxpayer's estimated income is discounted by a capitalization rate to convert anticipated income into present value. The appraiser can use either direct or yield capitalization. In this case, the Division decided to use direct capitalization. Under this approach, the rate is based upon the earnings-to-price ratios of comparable companies and debt rates.[2] The earnings-to-price ratios are determined by dividing the comparable companies' respective earnings by their respective stock prices.[3]

Various changes to the income approach used in the original assessment resulted in a decrease in Union Pacific's value under the income indicator by approximately $1.2 billion. The first change was the use of the comparable companies' average annual stock prices to derive the capitalization rate. In the 1989 case, the Commission adopted the use of average annual stock prices of comparable companies to compute the capitalization rate. During its negotiations with Union Pacific, the Division agreed to do the same, resulting in an increased capitalization rate. Dividing Union Pacific's income estimate by the higher capitalization rate decreased Union Pacific's value under the income indicator.[4]

1. A second alteration to the stock and debt indicator dealt with the method of allocating Union Pacific's stock to its railroad operations. The Division and Union Pacific agreed to rely solely on an allocation approach approved in the Commission's resolution of the 1989 case and revised the assessment accordingly. The result was an approximate $390 million reduction in the stock and debt indicator.

2. " 'Yield capitalization is a method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate or by developing an overall rate that explicitly reflects the investment's income pattern, value change, and yield rate.' " *Utah Assoc. of Counties v. Tax Comm'n*, 895 P.2d 819, 821 n. 3 (Utah 1995) (quoting American Institute

of Real Estate Appraisers, *The Appraisal of Real Estate* 420 (10th ed. 1992)).

3. An example of the direct capitalization concept is set forth in *Beaver County v. Utah State Tax Commission*, 916 P.2d 344, 348 n. 2 (Utah 1996).

4. A second change also led to an increase in the capitalization rate. This change dealt with the selection of comparable companies whose earnings and stock prices would be used to calculate an earnings-to-price ratio. The Division and Union Pacific agreed to select the same railroad companies approved by the Commission in the 1989 case. Along with the use of average annual stock prices, this resulted in an increased capitalization rate which, in turn, further decreased Union Pacific's value under the income indicator.

The third modification to the income indicator was not precipitated by the Commission's resolution of the 1989 case. In formulating earnings-to-price ratios in the derivation of capitalization rates, various methods are available to determine earnings. In the original assessment, the Division used a "straddle" earnings-to-price ratio. This ratio is calculated by dividing the stock price into the sum of the two most recent quarters' actual earnings and the next two quarters' forecasted earnings. However, in the revised assessment, the Division agreed to use a forecasted earnings-to-price ratio. Under this approach, the earnings are the next four quarters' forecasted earnings. The Division made this change because forecasted earnings present a better view of comparable companies' normalized earnings.

Following the corrections to the income and stock and debt indicators, the Division reconciled all of the indicators' results to a single estimate based upon its opinion of the relative applicability, accuracy, and probity of each indicator. The Division was also guided by the Commission's decision in the 1989 case. In that case, the Commission adopted a reconciliation scheme whereby 80% weight was given to the income indicator, 20% was given to the stock and debt indicator, and no weight was given to the cost indicator. In the settlement appraisal, these weights were used again.[5]

After reconciling the indicators into a single value estimate, the Division's appraisal for the total railroad value changed from $6.2 billion to $5.28 billion. A factor to apportion the value of the Utah portion of Union Pacific's railroad systems was applied, resulting in a $257,136,000 appraisal of market value. An equalization ratio of 85.06% was then applied. The product of this calculation fixed the railroad's taxable value in Utah at $218,719,882, a 27.4% reduction from the $301,320,000 original appraisal. In August 1993, Union Pacific and the Division stipulated to the Commission that this revised assessment represented the value of Union Pacific's railroad property within Utah for ad valorem tax purposes.

On September 16, 1993, the Commission entered an order directing the counties affected by the stipulated assessment to show cause why the Commission should not accept it as the value of Union Pacific's railroad properties in Utah for property tax purposes. On October 15, 1993, the Counties sought to raise the Commission's estimation of the railroad properties' value by filing numerous objections to the revised assessment's methodology.

On June 2, 1994, the Counties' objections were presented at a hearing before the Commission through the testimony of Eckhardt Prawitt, the Counties' appraisal expert. Most of the Counties' objections concerned the Division and Union Pacific's application of the income and stock and debt indicators of value. The Counties argued that the general use of average annual stock prices and bond yields under both indicators yielded an estimate of value as of July 1, 1989, rather than as of the statutory lien date, January 1, 1990.

The Counties further argued that the settlement appraisal's adoption of forecasted earnings and average annual stock prices to develop a capitalization rate under the income indicator resulted in error. The Counties contended that the adoption of forecasted earnings caused a mismatch between the earnings and the price in the earnings-to-price ratios. Mr. Prawitt testified that using average annual stock prices, the revised assessment valued comparable companies' stock prices as of July 1, 1989. However, using forecasted earnings, the expert continued, the comparable companies' earnings were the earnings for either the last two quarters of 1989 and the first two of 1990 or the four quarters of 1990, depending on the date of the appraisal. Either way, Mr. Prawitt concluded, the result is a mismatch between the prices and the earnings in the earnings-to-price ratio used to calculate a capitalization rate. According to the Counties, the better practice is to use the compa-

---

**5.** This amounted to another change in methodology from the original assessment, and although the Division could not report with specificity how this alteration affected the final outcome, it surmised that it may have reduced the final value by about $50 million.

rable companies' actual earnings and stock prices of the final two quarters in 1989.

Finally, the Counties contended that the settlement appraisal's use of forecasted earnings to develop a capitalization rate conflicted with the capitalization of Union Pacific's historical earnings. According to Mr. Prawitt, the comparable companies' earnings used in the earnings-to-price ratio should match the earnings discounted by the developed capitalization rate. For example, Mr. Prawitt testified, an acceptable appraisal would capitalize Union Pacific's year-end earnings, calculated as Union Pacific's 1989 income, by a capitalization rate derived from the comparable companies' year-end earnings in the earnings-to-price ratio. In contrast, Mr. Prawitt protested, the revised assessment capitalized historical earnings, calculated as Union Pacific's average income from 1985 through 1989, at a rate derived from forecasted earnings in the earnings-to-price ratio.[6]

In response, the Division's appraisal expert, D. Brent Eyre, assistant director of the Division, argued that the Counties' objections were unfounded. He testified that the general use of average annual stock prices rather than year-end stock prices was consistent with proper appraisal methodology. According to Mr. Eyre, use of such prices is "well within the confines of what is considered one of the appropriate judgments to make in the appraisal field."

Mr. Eyre also argued that in alleging that the revised settlement contained a mismatch within its capitalization rate, the Counties improperly characterized the use of average annual stock prices. Mr. Eyre testified as follows: The average annual approach to pricing stock does not value stock as of July 1 of the previous year. Rather, the aim of the average annual pricing approach is to reliably estimate the future value of the comparable companies' stock. Thus, the use of average annual stock prices did not conflict with the use of an earnings-to-price ratio calculated with forecasted earnings because

the stock prices chosen were estimates of future stock prices.

Mr. Eyre offered a similar rebuttal to the Counties' final objection to the revised appraisal's application of the income indicator. He testified as follows: Contrary to the Counties' contention, there was no mismatch between the development of the capitalization rate and Union Pacific's income stream. Rather, the Counties improperly characterized the way in which the revised assessment calculated Union Pacific's income. The use of five-year averaged income does not produce historical income; instead it produces an estimate of Union Pacific's future income. Like the use of average annual stock prices, use of five-year averaged income is justified as a way to estimate future income on the basis of an erratic earnings history. Put differently, to determine Union Pacific's future income, the Division had to consider past income that increased and decreased from year to year. To obtain an accurate estimate, the average of the income over the prior years was used. Thus, Mr. Eyre concluded, the use of averaged prior earnings did not conflict with the use of a capitalization rate derived from forecasted earnings because the averaged income was also an estimate of future income.

Following the hearing, the Commission requested supplemental information including the methodological basis for the original assessment, the underlying methodological basis for any changes to the original assessment, and a discussion of whether the original assessment and any subsequent adjustments thereto were appropriate representations of fair market value. The Division responded with the affidavit of Mr. Eyre. Mr. Eyre concluded that the methodologies adopted by the Division in the settlement were accepted methods for estimating fair market value for property tax purposes. Moreover, Mr. Eyre stated, many of the adjustments made by the Division were accepted by the Commission for the same taxpayer for the immediately

---

6. The Counties also objected to the settlement appraisal's (1) allocation of Union Pacific's equity to its railroad operation under the stock and debt indicator, (2) application of the cost approach, and (3) reconciliation of the income and stock and debt indicators. However, the Counties do not maintain these objections on appeal, and therefore, discussing them further is unnecessary.

preceding tax year and the Division knew of no change of circumstances concerning Union Pacific's railroad operations between the 1989 and the 1990 tax years that would require significant changes in the appraisal methodologies and their applications. "Given that the Commission determined the taxpayer's 1989 fair market value, there is no reason to believe that the consistent application of the same methodology to this taxpayer in 1990 would not arrive at a value consistent with a reasonable estimate of fair market value."

Unlike the Division, the Counties and Union Pacific responded to the Commission's request for information with briefs. In the Counties' brief, in addition to reiterating their objections to the revised assessment's appraisal methods, the Counties argued that the Commission lacked jurisdiction to consider the settlement assessment. The Counties claimed that under section 59–2–1007(3) of the Utah Code, the Commission had to render a written decision resolving Union Pacific's appeal by October 1, 1990. Because the Commission had not resolved Union Pacific's appeal by that time, the Counties concluded, the Commission lacked jurisdiction to approve the revised assessment and should reinstate the original assessment.

On December 12, 1994, the Commission, acknowledging jurisdiction over the matter, issued an order accepting the Division's valuation methodologies and adopting the revised assessment of Union Pacific's railroad properties in Utah. The Counties petitioned for review.

The Counties argue that (1) by delaying a ruling approving or disapproving the revised assessment beyond the statutory deadline, October 1, 1990, the Commission lost jurisdiction over Union Pacific's appeal; and (2) the Commission's approval of the revised settlement is inconsistent with both generally accepted appraisal theory and the Commission's statutory guidelines. The Commission and Union Pacific respond that (1) the statutory deadline is directory only, and the Commission's failure to meet the deadline does not result in its loss of jurisdiction over Union Pacific's appeal; and (2) the Commission's approval of the revised assessment was based on factual findings supported by substantial evidence and, therefore, the approval should be upheld.

## II. ANALYSIS

■ The first issue is whether the Commission lost its jurisdiction over Union Pacific's appeal by failing to issue a written decision by an October 1 statutory deadline set forth in section 59–2–1007(3) of the Utah Code. The standard of review for this issue is governed by section 59–1–610 of the Utah Code. That section provides, "When reviewing formal adjudicative proceedings commenced before the commission, the ... Supreme Court shall ... grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue before the appellate court." Utah Code Ann. § 59–1–610(1)(b). The proceeding from which the Counties appeal was a formal adjudicative proceeding. *See* Utah Admin. Code R861–1A–5. Also, the Commission's conclusion that failure to satisfy section 59–2–1007(3)'s deadline does not divest it of jurisdiction is a matter of statutory construction and therefore a conclusion of law. *See State v. Pena,* 869 P.2d 932, 935 (Utah 1994). And finally, section 59–2–1007 contains no explicit grant of discretion to the Commission. Thus, section 59–1–610(1)(b) demands that we review the Commission's conclusion under a correction of error standard.

■ Whether a statutory time frame is jurisdictional depends on whether the statute's time designation is "directory" or "mandatory." A designation is mandatory, and therefore jurisdictional, if it is " 'of the essence of the thing to be done.' " *Kennecott Copper Corp. v. Salt Lake County,* 575 P.2d 705, 706 (Utah 1978) (quoting 1A Sutherland, *Statutory Construction* § 25.03 (4th ed.)). However, a designation is merely directory, and therefore not jurisdictional, if it is " 'given with a view merely to the proper, orderly and prompt conduct of the business, and by the failure to obey no prejudice will occur to those whose rights are protected by the statute.' " *Id.* (quoting 1A Sutherland, *Statutory Construction* § 25.03 (4th ed.)).

The statute at issue in this case provides a means by which disgruntled taxpayers and counties may object to property tax assessments made by the Commission. Section 59–2–1007 states that dissatisfied taxpayers or any county upon a showing of reasonable cause may, on or before June 1, apply to the Commission for a hearing to voice objections to the Commission's annual assessment.[7] Utah Code Ann. § 59–2–1007(1). The statute further provides, "The commission shall set a time for hearing the objection and render a written decision no later than October 1." *Id.* § 59–2–1007(3). In this case, although Union Pacific timely appealed the Division's initial assessment on June 1, 1990, no written decision was rendered by the Commission until December 12, 1994, over thirty-eight months beyond the October 1, 1990, statutory deadline.

In a case recently argued to this court involving the Commission and all of the counties that are parties to this appeal, we held that section 59–2–1007(3)'s October 1 time designation was not mandatory, but merely directory and therefore not jurisdictional: "[S]ection 59–2–1007(3)'s time designation can only be viewed as a guide 'given with a view merely to the proper, orderly and prompt conduct' of the Commission's business. We hold that the Commission's failure to meet the October 1 deadline did not result in the loss of jurisdiction over [the taxpayer's] appeal." *Beaver County v. Utah State Tax Comm'n,* 916 P.2d 344, 352 (Utah 1996) (*PacifiCorp*). Because the Counties' arguments in this case are no more persuasive than their arguments in *PacifiCorp,* we apply that holding here. The Commission's failure to meet the October 1 deadline did not result in a loss of jurisdiction over Union Pacific's appeal.

The next issue is whether the Commission's approval of the revised settlement is consistent with generally accepted appraisal theory and the Commission's statutory guidelines. The Counties challenge three of the Commission's findings. The first is that the general use of average annual stock prices, rather than year-end stock prices, under the stock and debt and income indicators is consistent with proper appraisal methodology and the statutory mandate that the Commission value property for tax purposes as of January 1 of each year. *See* Utah Code Ann. § 59–2–201(1). According to the Counties, the use of average annual stock prices violated that mandate because as Union Pacific's stock rose steadily in price throughout 1989, the Commission, in effect, valued Union Pacific's railroad operations as of July 1, 1989.

The Counties' second challenge deals with a more particular application of average annual stock prices. The Counties challenge the Commission's finding approving the development of the capitalization rate. The employment of average annual stock prices, argues the Counties, conflicts with the use of forecasted earnings in the development of the capitalization rate used to discount Union Pacific's income. The result, the Counties maintain, was an impermissible mismatch stemming from the use of forward-looking earnings and backward-looking stock prices in the earnings-to-price ratio.

Finally, the Counties attack the Commission's approval of the application of the capitalization rate to discount the revised assessment's estimate of Union Pacific's income. The Counties maintain that while the revised settlement tabulated Union Pacific's income using the average of Union Pacific's income from 1985 through 1989, it discounted that income at a capitalization rate calculated with forecasted earnings. The result, the Counties contend, is that a forward-looking capitalization rate was improperly used to discount historical earnings.

▉▉▉ Union Pacific and the Commission respond that the Counties' challenges amount to attacks upon the Commission's findings of fact. Therefore, they argue, this court, affording deference to the Commission's fact-finding expertise, must apply "a substantial evidence standard on review." Utah Code Ann. § 59–1–610(1)(a). Under such a standard, we must uphold the Com-

---

7. The Commission must notify the taxpayer of its assessment by May 1 of each year. Utah Code Ann. § 59–2–201(1), (4).

mission's findings of fact if the findings "are supported by substantial evidence based upon the record as a whole." *Zissi v. State Tax Comm'n,* 842 P.2d 848, 852 (Utah 1992). Respondents further argue that the Commission's findings are supported by substantial evidence, namely, the testimony and affidavit of Mr. Eyre, assistant director of the Division and an expert in the field of appraisal.

The first question is whether the challenged findings are appropriately deemed findings of fact. In *PacifiCorp,* we held that the proper application of appraisal techniques was a question of fact:

> The proper application of appraisal techniques depends upon varying factual circumstances that defy generalization: " '[V]aluation is an art, not a science. It is a function of judgment, not of natural law.... [F]or example—true market value for purposes of ad valorem taxation is always an estimate, always an expression of judgment, always a result built on a foundation of suppositions about knowledgeable and willing buyers and sellers endowed with money and desire, whose desires are said to converge in a dollar description of the asset.' "

916 P.2d at 355 (quoting *Utah Assoc. of Counties v. Tax Comm'n,* 895 P.2d 819, 825 (Utah 1995) (alteration in original) (quoting *Union Pac. R.R. v. State Tax Comm'n,* 716 F.Supp. 543, 554 (D.Utah 1988))). Furthermore, in the same case, we addressed a nearly identical challenge to the Counties' attack on the Commission's approval of average annual stock prices. In *PacifiCorp,* the Counties argued that the Commission's acceptance of average annual stock prices violated section 59–2–201(1) of the Utah Code, directing the valuation of property as of January 1. We concluded that "the Commission did not violate section 59–2–201(1) by approving the use of average annual stock prices. The approval is more appropriately deemed a factual finding which will be upheld if supported by substantial evidence." *Id.* We will treat the Commission's challenged findings in this case similarly. The challenged findings shall be upheld if supported by substantial evidence.

As challengers of the Commission's factual findings, the Counties bear the burden of demonstrating that the factual findings are erroneous. To prevail, the Counties must marshal all of the evidence supporting the findings and show that despite the supporting facts and in light of the conflicting evidence, the findings are not supported by substantial evidence. *See Zissi,* 842 P.2d at 852; *Cornish Town v. Koller,* 758 P.2d 919, 922 (Utah 1988); *Grace Drilling Co. v. Board of Review,* 776 P.2d 63, 68 (Utah.Ct.App. 1989). " 'Substantial evidence' is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank v. County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990).

The first finding—approving the general use of average annual stock prices to determine the stock and debt indicator and the capitalization rate for the income indicator—is supported by substantial evidence. The expert of Union Pacific and the Division testified that the use of average annual prices is "well within the confines of what is considered one of the appropriate judgments to make in the appraisal field." In addition, Mr. Eyre pointed out, the Commission had approved the use of average annual stock prices in its resolution of the 1989 case, and he saw no change in circumstance that would warrant a departure from the previous approach to pricing stock. Because we find that the Commission's finding is supported by substantial evidence provided by Mr. Eyre, we uphold this finding of fact.

The second challenged finding—approving the revised assessment's development of the capitalization rate calculated with forecasted earnings and average annual stock prices—is also supported by substantial evidence. In his affidavit, Mr. Eyre stated that this method of developing a capitalization rate was an accepted method and consistent with appraisal theory. In response to the Counties' allegation of mismatching in the development of the capitalization rate, Mr. Eyre testified that the Counties mischaracterized the use of average annual stock prices. According to Mr. Eyre, the stock prices used were not historical stock prices but estimates of future

stock prices. Thus, Mr. Eyre explained, the use of average annual stock prices was wholly consistent with the use of forecasted earnings in the development of the capitalization rate. Because Mr. Eyre's affidavit and testimony are substantial evidence supporting the Commission's finding of approval, we uphold this finding.

The last challenged finding—approving the use of a capitalization rate developed with forecasted earnings to discount Union Pacific's income derived from the average of its past five years' earnings—is also supported by substantial evidence. Mr. Eyre averred that this method was considered a well-accepted practice among appraisal experts. And by way of reply to the Counties accusation of mismatching stemming from the use of a forward-looking capitalization rate to discount backward-looking income, Mr. Eyre testified that the Counties mischaracterized the calculation of income in a manner similar to their mischaracterization of the use of average annual stock prices. According to Mr. Eyre, the five-year averaged earnings were not employed as historical earnings but as an estimate of future earnings. Thus, Mr. Eyre concluded, the discounting of five-year averaged earnings was wholly consistent with the use of a capitalization rate derived in part from forecasted earnings. Since the Commission's finding of approval is supported by substantial evidence, we uphold this finding.

### III. CONCLUSION

We conclude that (1) the Commission did not lose jurisdiction over Union Pacific's appeal by failing to issue a written decision by the statutory deadline; and (2) the Commission's challenged findings are factual findings that are supported by substantial evidence. We therefore affirm.

ZIMMERMAN, C.J., and HOWE and DURHAM, JJ., concur in Justice RUSSON'S opinion.

STEWART, Associate Chief Justice, separate opinion:

I concur with the majority opinion that the Utah State Tax Commission did not lose jurisdiction over Union Pacific Railroad Company's appeal by failing to decide that appeal with a written decision within the statutory deadline specified in Utah Code Ann. § 59–2–1007(3). I agree that the "deadline" is directory only, not mandatory.

However, I do not agree that the various components of the valuation formulae that the Commission employs in computing a fair market value are properly characterized as "factual findings" and that all the Court needs to do is determine whether those findings are supported by substantial evidence, i.e., the *opinion* of a Commission expert that a particular formula or a variation of a formula is appropriate. For example, such issues as whether the Commission can properly use *future* projected earnings combined with a *past* annual average stock price to compute a capitalization rate under the income indicator is simply not a factual issue. In this case, there is no issue as to the accuracy of the empirical facts used to calculate the average stock price or the future price/earnings ratio. The issue the Court should decide but does not is the propriety of capitalizing earnings by using a past average stock price and projected future earnings to compute a price/earnings ratio as a tool for valuing a corporation.

The Counties contend that the Commission employed a "forward looking capitalization rate [that] was improperly used to discount historical earnings." In my view, the Counties deserve an analysis of that issue. Instead, the Court offers the unfounded conclusion that this issue and several similar issues are inherently factual and that the "findings" should be sustained because the Commission's expert witness testified that such an approach was appropriate.

The propriety of various valuation formulae, as raised in this case, cannot be addressed by "findings of fact," as that term is ordinarily used. Whether the various valuation formulae the Commission employs in this case are appropriate does not depend upon the Commission's findings of empirical data relevant to the formula employed. Rather, the propriety of the Commission's formulae depends upon whether they are logical, reasonable, and produce valuations that comport with how similar businesses are usually valued and, most importantly, whether the methodology meets the standards im-

posed by Article XIII of the Utah Constitution.

For this Court to exercise its constitutional duty to assure compliance with Article XIII, it must evaluate Commission decisions to assure that they are based on methodologies and formulae that effectuate constitutional requirements. Of course this Court should not, nor could it, engage in a de novo review of the Commission's rulings. Market valuations are concededly inherently judgmental and not subject to precise measurements, but valuation methods must be based on formulae that are reasonable, consistently applied within an industry, and based on realistic assumptions and conclusions.

The Commission has developed significant and substantial expertise in dealing with highly complicated matters of valuation, which, as the majority opinion points out, do indeed involve matters of opinion and judgment. For that reason, it is appropriate for this Court to defer to the Commission's expertise, as long as the methodology rests on a reasonable and consistent application of sound principles for determining fair market value. It is hardly appropriate, however, for this Court to act as if the Commission's methodology is an issue of fact whereby this Court all but abandons its constitutional and statutory responsibilities of judicial review by treating that which is not a factual inquiry as if it were.